## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND and | ) | |
| LABORERS' WELFARE FUND OF THE | ) | |
| HEALTH AND WELFARE DEPARTMENT | ) | |
| OF THE CONSTRUCTION AND GENERAL | ) | |
| LABORERS' DISTRICT COUNCIL OF | ) | |
| CHICAGO AND VICINITY, and JAMES S. | ) | |
| JORGENSEN, Administrator of the Funds, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 08 C 2269 |
| v. | ) | |
| | ) | Judge Zagel |
| GALLOY AND VAN ETTEN, INC., an Illinois | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR ENTRY OF DEFAULT JUDGMENT IN SUM CERTAIN

Plaintiffs, Laborers' Pension Fund and Laborers' Welfare Fund of the Health and

Welfare Department of the Construction and General Laborers' District Council of

Chicago and Vicinity, and James S. Jorgensen, Administrator of the Funds, (collectively

"Funds"), by their attorney, Jerrod Olszewski, respectfully move for an Entry of Default

Judgment in Sum Certain against Defendant Galloy and Van Etten, Inc., an Illinois

corporation ("Company"). In support of this Motion, Plaintiffs state as follows:

1.      Funds filed their Complaint on April 21, 2008 seeking to compel

Company to pay delinquent contributions, liquidated damages, and interest on an audit

covering the time period of April 1, 2004 through May 31, 2006, and attorneys fees and

costs.

2.      Summons and Complaint were personally served upon Company's President on April 30, 2008.  A true and accurate copy of the Affidavit of Service is attached hereto as Exhibit A.

3.       Company failed to file an Answer or otherwise plead.  Accordingly, Company is in default.

4.      As set forth in the Affidavit of Michael Christopher, filed contemporaneously herewith and attached hereto as Exhibit B, Funds are entitled to delinquent contributions, liquidated damages, interest, audit costs, and attorneys fees and costs.  See Exhibit B, ¶ ¶ 1 through 5.

5.      As set forth in the Declaration of Jerrod Olszewski, filed contemporaneously herewith and attached hereto as Exhibit C, the Funds incurred $1,522.10 in attorneys fees and costs in this matter.

6.      Pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. §185, federal common law, the Agreement, and Funds' respective Agreements and Declarations of Trust, Funds are entitled to judgment in the amount of $1,522.10 against Defendant Galloy and Van Etten, Inc.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in Plaintiffs' favor and against Defendant Galloy and Van Etten, Inc., as follows:

A.      For $1,522.10 representing attorneys' fees and costs; and

B.    Ordering Defendant to pay post judgment interest on all amounts

due from the date of judgment until the judgment is satisfied.

June 11, 2008

Respectfully submitted,

Laborers' Pension Fund, et al.

By: /s/  Jerrod Olszewski

Patrick T. Wallace
Jerrod Olszewski
Christina Krivanek
Amy N. Carollo
Charles Ingrassia
Laborers' Pension and Welfare Funds
111 W. Jackson Blvd., Suite 1415
Chicago, IL  60604
(312) 692-1540

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| LABORERS' PENSION FUND; ET AL | | COURT DATE: |
|---|---|---|
| | PLAINTIFF(S) | Case No. **08 CV 2269** |
| vs. | | |
| **GALLORY AND VAN ETTEN, INC** | | SERVICE DOCUMENTS: **SUMMONS & COMPLAINT** |
| | DEFENDANT(S) | |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not party to nor interested in the above entitled action, and is competent to be a witness therein.

On **Apr 30, 2008**, at **10:16 AM**, I served the above described documents upon **GALLORY AND VAN ETTEN, IN(** shown below:

**CORPORATE SERVICE** was made by leaving a true and correct copy of the documents with **JACK VAN ETTEN PRESIDENT**, an officer, managing agent or authorized agent of the within named company.

Said service was effected at **11756 S. HALSTED, CHICAGO, IL 60628.**

**DESCRIPTION:** Gender: **M**  Race: **WHITE**  Age: **60**  Hgt: **6'0"**  Wgt: **200**  Hair: **GRAY**  Glasses: **YES**

I declare under penalties of perjury that the information contained herein is true and correct.

**Barry A Savage**, Lic #: **117-001119**
**Judicial Attorney Services, Inc.**
**2100 Manchester Rd., Ste 900**
**Wheaton, IL 60187**
**(630) 221-9007**

SUBSCRIBED AND SWORN to before me this 30th day of April, 2008

NOTARY PUBLIC

OFFICIAL SEAL
JOAN C HARENBERG
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/13/09



EXHIBIT
A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )
)
             **Plaintiffs,** )    **Case No. 08 C 2269**
)
    **v.** )    **Judge Zagel**
)
GALLOY AND VAN ETTEN, INC., an Illinois )
corporation, )
)
             **Defendant.** )

## AFFIDAVIT OF MICHAEL CHRISTOPHER

MICHAEL CHRISTOPHER, being first duly sworn on oath, deposes and states as follows:

1.      I am a Field Representative employed by the Laborers' Pension Fund and the Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago and Vicinity (hereinafter collectively referred to as the "Funds"), Plaintiffs in the above-referenced action. My responsibilities include oversight of the collection of amounts owed by Defendant Galloy and Van Etten, Inc. (hereinafter "Company"). This Affidavit is submitted in support of the Laborers' Funds' Motion for Entry of Default Judgment in Sum Certain. I have personal knowledge regarding the statements contained herein.

2.      On June 1, 2003, Company signed a Collective Bargaining Agreement, ("Agreement") with the Construction and General Laborers' District Council of Chicago and Vicinity ("District Council") and Laborers' Local Union No. 225. A true and



EXHIBIT
B

accurate copy of the Agreement is attached hereto as Exhibit B-1. Pursuant to the Agreement, Company submitted monthly benefits reports. Copies of Company's June, 2003 through May, 2006 benefits reports are attached hereto as Exhibit B-2. Pursuant to the terms of the Agreement, Company is bound to the terms of the Funds' respective Agreements and Declarations of Trust.

      3.     Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of District Council for union dues owed to District Council.

      4.     The Agreement and Funds' respective Agreements and Declarations of Trust, to which Company is bound, require that Company submit benefits reports and contribution payments by the tenth day of the following month. Payments which are not received within thirty days of this date are assessed liquidated damages in the amount of 20 percent of the principal amount of delinquent contributions. The Agreement and Funds' respective Agreements and Declarations of Trust also obligate Company to obtain a surety bond to insure future wages and fringes. The Agreement and Funds' respective Agreements and Declarations of Trust also obligate Company to pay Funds' reasonable attorneys fees and costs incurred in collecting any delinquencies owed to the Funds. A copy of the relevant portions of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund is attached as Exhibit B-3; and a copy of the relevant portions of the Amended Health and Welfare Department of the Construction and General Laborers' District Council is attached as Exhibit B-4.

      5.     Company submitted payment of the delinquent amounts revealed by the audit, including liquidated damages and audit costs, but failed to pay Funds' attorneys fees and costs incurred in collecting the foregoing delinquencies.

**FURTHER AFFIANT SAYETH NAUGHT.**

Michael Christopher

Subscribed and sworn to before me
this 11th day of June, 2008.

Notary Public

OFFICIAL SEAL
ELIZABETH A. GALLAGHER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4-13-2012

# COLLECTIVE BARGAINING AGREEMENT

### BETWEEN

# GALLOY & VAN ETTEN CUT STONE

### AND

### LABORERS' LOCAL UNION 225
2500 EAST DEVON, SUITE 101
DES PLAINES, IL 60018

### AND

### THE CHICAGO LABORERS' DISTRICT COUNCIL
101 BURR RIDGE PARKWAY, SUITE 300
BURR RIDGE, IL 60527

### AFFILIATED WITH

### LABORERS' INTERNATIONAL UNION
OF NORTH AMERICA, AFL-CIO

### JUNE 1, 2003

### TO

### MAY 31, 2006



EXHIBIT
B-1

that either party may invoke the grievance procedure, and reach a decision in the matter provided

in the previous Article for the settlement of grievances or as to the clause or provision to be

inserted in this Agreement in lieu of the provision, which has become null and void.

### ARTICLE XXVI
### SUCCESSORS

This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and

heirs, administrators, successor and assigns.  In the event the Employer assigns or transfers his

business, whether voluntarily or involuntarily, the Employer's successors, assignees, or

transferees shall assume all rights, privileges, duties, and obligations with respect to the

employees covered herein and the Union.

### ARTICLE XXVII
### TERM

This Agreement shall remain in force and effect from June 1, 2003 through May 31,

2006, at which time it shall terminate without further notice.  The parties agree to execute upon

request a complete contract incorporating all of the terms herein.  This Agreement may be

executed in counterparts which together shall constitute a complete document.

### ARTICLE XXVIII
### MANAGEMENT RIGHTS

The Union recognizes that rights, powers, and responsibilities belong solely to and are

exclusively vested in the Company whether or not the Company has made use of the right,

power, authority or responsibility and such are not subject to bargaining except only as they may

be subject to a specific obligation of this Agreement.   Among these rights, powers, and

responsibilities, but not wholly inclusive, are all matters concerning or related to the

management of the business and administration thereof, and the direction of the working forces,

including (but not limited to) the right to suspend, discipline, or discharge for cause; to lay off

for lack of work or for any other legitimate reason; to hire, classify, transfer (temporarily or

## Table of Contents

ARTICLE I .................................................................................................................. 1

    SECTION 1 - ETHICAL PRACTICES ................................................................. 1
    SECTION 2 - EQUAL OPPORTUNITY EMPLOYMENT ................................... 1

ARTICLE II UNION RECOGNITION ......................................................................... 1

ARTICLE III GEOGRAPHICAL JURISDICTION ...................................................... 1

ARTICLE IV .............................................................................................................. 2

    SECTION 1 - UNION SECURITY ....................................................................... 2
    SECTION 2 - CHECK-OFF OF UNION MEMBERSHIP DUES .......................... 3
    SECTION 3 - WORKING DUES DEDUCTION .................................................. 4
    SECTION 4 - SAVING CLAUSE ........................................................................ 4

ARTICLE V NO STRIKE/NO LOCKOUT .................................................................. 4

ARTICLE VI GRIEVANCE PROCEDURE .................................................................. 5

    SECTION 1 - DEFINITION .................................................................................. 5
    SECTION 2 - FIRST STEP ................................................................................... 5
    SECTION 3 - SECOND STEP .............................................................................. 5
    SECTION 4 - THIRD STEP .................................................................................. 5
    SECTION 5 - FOURTH STEP ............................................................................. 5
    SECTION 6 - ARBITRATORS ............................................................................ 6
    SECTION 7 - LIMITATIONS – TIME AND PLACE .......................................... 6

ARTICLE VII WORKDAY AND WORKWEEK ........................................................ 7

ARTICLE VIII WORK RULES .................................................................................. 7

    SECTION 1 - OVERTIME .................................................................................... 8
    SECTION 2 - HOLIDAYS .................................................................................... 9
    SECTION 3 - SHIFT WORK ................................................................................ 9
    SECTION 4 - SHOW-UP PAY ............................................................................ 9
    SECTION 5 - SAFETY AND HEALTH ............................................................. 10
    SECTION 6 - PAY DAY ..................................................................................... 10
    SECTION 7 - TRANSPORTATION ................................................................... 11
    SECTION 8 - FEDERAL AND STATE COVERAGE ....................................... 11
    SECTION 9 - ACCIDENTS ................................................................................ 11

ARTICLE IX PAYMENT OF WAGES/AUDITS ....................................................... 11

    SECTION 1 - AUDITS ....................................................................................... 12
    SECTION 2 - FAILURE TO PAY WAGES ...................................................... 12

ARTICLE X PENSION .............................................................................................. 12

ARTICLE XI WELFARE ........................................................................................... 13

ARTICLE XII SUPERVISORS AND FOREMEN ..................................................... 14

ARTICLE XIII UNION RIGHTS ............................................................................... 14

    SECTION 1 - JOB INSPECTION ...................................................................... 14
    SECTION 2 - STEWARD ................................................................................... 15
    SECTION 3 - MEMBER IN GOOD STANDING ............................................. 15

ARTICLE XIV WAGES ............................................................................................. 15

    SECTION 1 - PACKAGE INCREASE ............................................................... 16
    SECTION 2 - PREMIUM RATE ........................................................................ 17

ARTICLE XV OVERTIME ........................................................................................ 17

ARTICLE XVI VACATIONS ................................................................................... 17

ARTICLE XVII PLANERMEN ................................................................................ 18

ARTICLE XVIII JOURNEYMEN .......................................................................... 18

    SECTION 1 - WORK PERFORMED BY UNION JOURNEYMEN ........................... 18

ARTICLE XIX APPRENTICES ............................................................................... 20

    SECTION 1 - NUMBER OF APPRENTICES EMPLOYED ...................................... 20
    SECTION 2 - GRINDING TOOLS ........................................................................... 20
    SECTION 3 - WORKING HOURS ........................................................................... 20
    SECTION 4 - TOOLS ................................................................................................ 20
    SECTION 5 - OPPORTUNITY TO LEARN BUSINESS .......................................... 20

ARTICLE XX ............................................................................................................ 21

    SECTION 1 - CRAFTSMANSHIP AND SAFETY ................................................... 21
    SECTION 2 - NOTIFICATION ................................................................................ 21

ARTICLE XXI SUBCONTRACTING ...................................................................... 22

    REBATES ................................................................................................................. 22

ARTICLE XXII CLOTHING ALLOTMENT ........................................................... 22

ARTICLE XXIII DRUG & ALCOHOL TESTING ................................................... 23

ARTICLE XXIV ENTIRE AGREEMENT OF PARTIES ......................................... 24

ARTICLE XXV INVALIDITY AND SEVERABILITY ............................................ 24

ARTICLE XXVI SUCCESSORS ............................................................................... 25

ARTICLE XXVII TERM ........................................................................................... 25

ARTICLE XXVIII MANAGEMENT RIGHTS .......................................................... 25

# ARTICLE I

**Section 1 - Ethical Practices**      All parties mutually agree to cooperate fully in every legal and proper way to establish and maintain, between themselves and within the territory in which they shall operate, a code of ethics and fair practices, which will ensure compliance with the specific terms of this Agreement, and to direct their efforts individually and collectively as circumstances may warrant and justify to the elimination of destructive practices.

**Section 2 - Equal Opportunity Employment**      The Employer and the Union agree that there shall be no discrimination against any employee because of race, color, religion, sex, age (as required by law), national origin, and/or Union affiliation.  Whenever the male gender appears or is used in this Agreement, it shall also be held to apply to females.

# ARTICLE II
# UNION RECOGNITION

The Employer recognizes the Union as the sole and exclusive representative of all of its stonecutters, carvers, planerman, sawyers, and various classification of laborers for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment.  All new machinery used to perform or replace work traditionally performed by employees is covered by this agreement.

# ARTICLE III
# GEOGRAPHICAL JURISDICTION

The geographical area covered by this Agreement shall be Boone, Cook, Grundy, Kendall, McHenry, Will, Dupage, Kane, Lake and Kankakee Counties, Illinois and Lake County, Indiana.

1

## ARTICLE IV

### Section 1 - Union Security

A.      All new employees shall be required to join the Union after the expiration of thirty (30) days of employment, or thirty (30) days after the execution of this Agreement, whichever is later, and shall remain members, in good standing, of the Union as a condition of employment. Good standing shall mean tender of the initiation fees and dues uniformly required as a condition of acquiring or retaining membership.

B.      Employees covered by this Agreement at the time it is signed and who are members of the Union at that time, shall be required, as a condition of continued employment, to continue membership in the Union for the duration of this Agreement.

C.      Employees covered by this Agreement at the time it is signed and who are not members of the Union at that time, shall be required to join the Union thirty (30) days after the execution of this Agreement and remain members of the Union, in good standing, as a condition of employment. Upon receipt or written notice from the Union, the Employer shall discharge any employee who fails to become, or is not, a member of the Union on the prescribed day, provided membership was available under the same terms and conditions as generally applicable to other members. The Employer shall not discharge or cause an employee to lose any work under this Article, except upon notice from the Union as set forth herein.

### Section 2 - Check-Off of Union Membership Dues

A.    To assist its employees in their obligation to maintain their Union membership through the payment of initiation fees and regular current quarterly dues, uniformly charged, the Employer will honor, from each employee, a voluntary, revocable wage assignment authorizing the Employer, during the life of this Agreement, to deduct twenty-five dollars ($25.00) per day, from the wages then owing to the employees, to apply on initiation and readmission fees prescribed by the Union until said fees and/or dues are paid in full.

B.    All amounts deducted shall be remitted promptly by the Employer to the Secretary/Treasurer of the Union, weekly, and the Secretary/Treasurer shall acknowledge receipt of the money.

### Section 3 - Working Dues Deduction

A.    The Employer shall deduct from the wages of employees, covered by this Agreement, working dues in the amount of twenty-five cents ($0.25) for each hour paid or any increase in working dues that may be instituted thereafter, and shall remit the amounts collected to the Union, using the transmittal forms provided. Working dues contributions are due not later than the tenth (10th) of the month next following the month for which deductions are made. Checks will be made payable to the Construction and General Laborer's District Council of Chicago and Vicinity.

B.    It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and that such deductions be made only pursuant to written assignments from each employee on whose account such deductions are made, which assignment shall not be irrevocable for a period of more than one (1) year or beyond the termination date of this Agreement, whichever occurs sooner.

C.    The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action or otherwise, as regards the creation and administration of the dues check-off established by this Agreement and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys' fees on behalf of the beneficiaries of such indemnity.

### Section 4 - Saving Clause

A.    It is the intention of the parties to fully comply with the provision of the Labor Management Relations Act of 1947, and all acts amendatory thereto, anything herein to the contrary notwithstanding.

B.    Any provision herein, which is contrary to or held to be in violation of any State or Federal Law, shall be void and of no force or effect, and this Agreement shall be construed as though such provisions were not a party hereof; it being intended that the other provisions of this Agreement shall not be affected thereby.

## ARTICLE V
## NO STRIKE/NO LOCKOUT

During the term of this Agreement, unless otherwise provided herein, neither the Union, nor any of its members, officers, stewards, agents or representatives, nor any employee, shall instigate, authorize, call, support, sanction, encourage, maintain, or in any way take part or participate in any strike, sympathy strike, walkout, work stoppage, work slowdown, work curtailment, boycott or other interference with the Company's business, refusal to cross picket line(s) at the Company's facility, cessation or interruption of work or production, or in any picketing of the Company's premises for any reason (or the premises or facilities of any of the Company's customers or suppliers because of any dispute between the Company and the Union or any of the Company's employees).

The Company will not lock out employees during the term of this Agreement.

4

## ARTICLE VI
## GRIEVANCE PROCEDURE

<u>Section 1 - Definition</u>    For the purpose of this Agreement, a grievance is a difference of opinion with respect to the meaning and application of the terms and conditions of this Agreement.  Grievances shall be taken up in the following manner:

<u>Section 2 - First Step</u>    Any employee who has a grievance shall first discuss it with his Supervisor.

<u>Section 3 - Second Step</u>    If the grievance is not settled in the first step and the employee wishes to appeal, the grievance shall be presented to the Union Steward and the Plant Manager or Superintendent.

<u>Section 4 - Third Step</u>    If not satisfactorily settled in the foregoing step, the grievance is to be reduced to writing and referred to the Business Manager, or his assignee of the Union who shall have the right to present the grievance to the Company's duly authorized representative.

<u>Section 5 - Fourth Step</u>    Grievances that are not satisfactorily settled in accordance with the foregoing procedure may be referred by either party to an impartial arbitrator agreed upon by the Company and the Union.

<u>Section 6 - Arbitrators</u>    Arbitrators will be selected for single issues only. Only one grievance will be submitted to any one arbitrator at any one time, an arbitration hearing will be confined to a single grievance.

In the event the parties are unable to agree upon an arbitrator within ten (10) days, a request to the Federal Mediation and Conciliation Service pursuant to the voluntary rules of labor arbitration for designation of an impartial arbitrator will be submitted for a panel of qualified arbitrators.  An arbitrator will be chosen from this panel by the Company and the Union alternately striking the names of those not acceptable to each.  The party who strikes the first name from the panel shall be determined by lot.

The decision of the arbitrator shall be final and binding upon the parties.  It is agreed, however, that the arbitrator shall not have the right to add to, to ignore, take from, or to modify any of the terms and conditions of this Agreement.  The costs and expenses of arbitration shall be divided equally between the parties.

It shall be the duty of any arbitrator hearing cases under this Agreement to justify each award by written decision explaining the rationale of said award.

**Section 7 - Limitations – Time and Place**        Grievances shall be presented promptly and in any event within three (3) working days after the cause of the alleged grievance occurs.  In the event an appeal is not taken within three (3) working days from any step of the foregoing grievance procedure, the matter shall be considered as finally settled at that step.  Any working time that is lost under this procedure for the presentation of grievances shall be paid by the Company at the employee's hourly rate.

## ARTICLE VII
## WORKDAY AND WORKWEEK

**Section 1 -**  The working day shall not exceed eight (8) hours per day or five (5) days per week, from Monday to and including Friday, thus constituting a working week of not in excess of forty (40) hours, such working hours shall be between the hours of 6:00 a.m. and 5:00 p.m.

# ARTICLE VIII

## WORK RULES

### Section 1 - Overtime:

A.    **Overtime**  This Article is intended only to be construed as a basis for overtime and shall not be construed as a guarantee of hours of work per day or per week.  Overtime shall not be paid more than once for the same hours worked.

B.    **Overtime Pay**  Employees shall be paid one and one-half (1-½) times their gross hourly rate of pay for all hours worked over forty (40) during a workweek

employees shall be paid one and one-half (1 ½) times their gross hourly rate of pay for all hours worked in excess of eight (8) hours per day if the employee was available to work for the full week except for contractual time off.  Contractual time off is defined as vacation, holiday, jury duty, funeral leave and Employer granted leave.  Employees shall be paid double time (2 times) their gross hourly rate of pay for all hours worked on their 7th workday.

C.    **Scheduling of Overtime**

1.    The company has the right to schedule and assign employees to work overtime.  Available overtime work shall be distributed as far as reasonably practicable under plant operations, among qualified employees in the classification, in a fair and just manner, in which the available overtime work arises.

2.    The Employer shall post, in writing, in a conspicuous place, a notice twenty-four (24) hours before any scheduling of overtime work.

7

Each effected employee must respond to each requested overtime schedule. No employee shall be disciplined for refusal of overtime work if just cause is provided.

Employees who agree to scheduled overtime and do not work, shall be subject to disciplinary action.

### Section 2 – Holidays

No non-probationary employee shall be permitted to work Sundays or Legal Holidays of:

| | | | |
|---|---|---|---|
| (1) | New Year's Day | (5) | Thanksgiving Day |
| (2) | Memorial Day | (6) | Christmas Eve Day |
| (3) | Fourth of July | (7) | Christmas Day |
| (4) | Labor Day | (8) | New Year's Eve Day |

or the days celebrated as such, except in case of emergency (then Section 1, Article VIII applies).

A.   Holidays falling on Sunday shall be observed on the following day, Monday. Holidays falling on Saturday shall be observed on the preceding day, Friday.

B.   It is understood by both parties that to be eligible for holiday pay, the employee must work the regular working day before, and the regular working day after, said holiday.

C.   Any new employee who has worked continuously for sixty (60) calendar days prior to a holiday shall be paid for the above named holidays without performing work on said days at the rate of eight (8) hours straight time.

D.   If an employee is laid-off within ten (10) working days prior to a holiday, he shall be eligible to receive pay for said holiday.

E.   When a holiday occurs during an employee's paid vacation, he shall receive an additional day's pay for such holiday.

8

F.    Every employee shall also receive one (1) floating holiday, which must be scheduled two weeks prior to taking it.  If the employee elects not to take the holiday, the employee will be paid eight (8) hours wages at the applicable rate of pay.

**Section 3 - Shift Work**    When work is carried on in an extra shift, employees shall receive five percent (5%) more per hour than the wage stipulated in this Agreement.

**Section 4 - Show-Up Pay**    Any employee who reports to work as scheduled, not having been notified at least one (1) hour in advance not to report, shall be entitled to two (2) hours work or two (2) hours pay in lieu thereof, at his regular straight time rate.  All employees are to have a current working telephone number on file with the Company for purposes of advance notification of work unavailability.

Except where lack of work is due to a *force majeure* (e.g., fire, flood, other act of God, utility failure or emergency mechanical breakdown, as opposed to work unavailability due to routine maintenance) any employee who has started to work and who, through no fault of his own, works less than four (4) hours, will be paid for four (4) hours, and any employee who works longer than four (4) hours but, through no fault of his own, works less than eight (8) hours, shall be paid for eight (8) hours, provided the employee is available for any work throughout such period.

**Section 5 - Safety and Health**

A.    The Employer shall thoroughly protect the employees during the months of June through September, inclusive, during working hours from sun and rain; and November through April inclusive, from cold and snow.  No employee shall be required to work in temperature extremes of below ten (10) degrees above zero Fahrenheit or above one hundred (100) degrees above zero Fahrenheit at the official U.S. Weather Bureau reporting station, unless it is on a

voluntary basis with each individual employee. The exception to this will be only if the work site can be heated to maintain a temperature of twenty-five (25) degrees above zero Fahrenheit during regular working hours.

B.     Employees shall report to management complaints of conditions considered unsanitary or injurious to health. The Employer shall investigate all such complaints in a timely manner and shall take any action it deems necessary. In the event the Union finds the Employer's actions to be unreasonable, it may grieve in accordance with Article VI.

<u>Section 6 - Pay Day</u>   Employees shall be paid on the job, before quitting time, on Friday of each week, for the work done up to, and including Thursday, preceding, except when regular pay day is a legal holiday, in which case, they shall be paid on the day before such holiday at quitting time.

If an employee is discharged or laid-off for any reason, or quits, they shall be paid for all hours worked on the next regular payroll date after such an event.

<u>Section 7 - Transportation</u>       No employee shall be required to furnish means of transportation of tools, equipment, or materials, to or from jobs designated by Employer, in their own car. If any employee is willing, at the request of his Employer, to furnish their own means of transportation of tools, equipment, or materials to and/or from jobs and shops, they are to be reimbursed at the rate of thirty-two cents ($0.32) per mile for furnishing this transportation, plus their regular hourly rate when, and if traveling is done within the regular eight (8) hour day. Transportation on Saturdays, Holidays, or Sundays, then the overtime rate shall apply.

<u>Section 8 - Federal and State Coverage</u>  Every Employer, regardless of the number of employees, shall become subject to, and operate under, the Federal Social Security Act and the Illinois Unemployment Compensation Act, as well as the Illinois Workmen's Compensation Act and the Illinois Occupational Diseases Act and shall conform to and provide such insurance and benefits.  The Employer shall furnish the Union with their unemployment insurance account number.

<u>Section 9 - Accidents</u>      Employees must immediately report all accidents to the shop foreman who shall within 24 hours report any such accident which may occur to the Union steward.

**ARTICLE IX**
**PAYMENT OF WAGES/AUDITS**

All weekly payrolls shall be paid in United States currency, or by payroll check showing social security, straight time and overtime hours, regular rate of pay, withholding and other deductions.  If the Employer fails to have sufficient funds to meet all paychecks issued to employees it shall be required to pay, in addition to amounts due for wages, all penalties incurred by the employee and as well as costs and expenses incurred in collecting the amount due. Thereafter the defaulting Employer shall furnish an indemnity bond satisfactory to the Union, which bond shall protect the employees for their wages in full.

**Section 1 - Audits**  The Union shall have the right at reasonable times, and upon prior request to the Employer, to audit records relating to wages and Pension and Welfare Trust contributions to ensure compliance with the Employer's obligations under this Agreement. This does not limit any other legal right the Union may have with respect to relevant information requests.

**Section 2 - Failure to Pay Wages**  Failure to pay wages provided shall constitute a breach of this Agreement notwithstanding anything else contained herein, and the employees and the Union shall have the right to take such steps as they deem necessary to collect such wages including, but not limited to, the right to strike.

The Employer agrees it will send to the Union office all checks in settlement of all Union grievances regarding wages, hours, and other working conditions where the employee is entitled to such payments. (Checks made out to employee). Where any check is paid directly to the employee, such grievances will be considered not settled.

## ARTICLE X
## PENSION

Amend to provide that, effective June 1, 2003 to May 31, 2004, the Employer will pay Pension contributions of one dollar and fifty three cents ($1.53) per hour, in addition to the wages stipulated, plus additional sums as may be allocated by the Union, in its sole discretion, from the second and third years' total economic package. This to be paid on a forty-hour workweek.

12

## ARTICLE XI
## WELFARE

Effective June 1, 2003 to May 1, 2004, the Employer will pay Health and Welfare contributions of three dollars and eighty nine cents ($3.89) per hour in addition to the wages stipulated, plus additional sums as may be allocated by the Union, in its sole discretion, from the second and third years' total economic package.

The Employer agrees to pay the amounts which it is bound to pay under this Agreement to the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and to become bound by, and be considered a party to, this Agreement and Declaration of Trust, creating said trust funds as if it had signed the original copies of the trust instruments and amendments thereto, the Employer ratifies and confirms the appointment of the Employer Trustees who shall, together with the successor Trustees designated in the manner provide in said Agreements and Declaration of Trust, and jointly, with an equal number of Trustees appointed by the Union, carry out the terms and conditions of the trust instruments.

The Trustees of the Welfare Fund shall have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether, and to what extent, benefits are to be provided for covered employees.

The failure of the Employer to contribute to the said Welfare Fund, as provided herein, shall for the purpose of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers, whom they represent, from any job for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

13

## ARTICLE XII

**Section 1 - Supervisors**     The Employer shall be completely free to select a Shop Superintendent who shall be an agent of the Employer, and not of the Union. Such a Shop Superintendent shall not, however, be permitted to perform any of the work covered by the provisions of this Agreement.

**Section 2 -  Foremen**     The Employer may also employ working foremen who may cut stone and perform work herein covered, provided, however, such working foremen shall be competent journeymen subject to all of the terms and conditions of this Agreement and shall not be allowed to cut stone or remain in or around the job site or shop site before or after regular working hours, unless appropriate overtime rates are paid. The working foreman shall not exercise any of the functions customarily exercised by supervisors within the meaning of the National Labor Relations Act, as amended, nor shall he, in any way, be considered an agent of the Union.

## ARTICLE XIII
## UNION RIGHTS

**Section 1 - Job Inspection**     The President or Business Manager of the Union, or his representative carrying proper credentials of the Union, shall at all times have the privilege during working hours, to go through the shop or job to transact whatever legitimate business he may have to perform, but he shall in no way hinder or delay work and provided further that the Union representative signs in.

**Section 2 - Steward**     The Union shall have the right to appoint a Steward in the shop and he shall not be an official of the Union. No Steward shall be discriminated against for performing his/her duties as a Steward. In accordance with Article VI, the Steward shall have the right to assist employees in connection with the handling of Second Step grievances and interpretation of the collective bargaining agreement. The Steward will report all

14

violations to the Business Representative of the Union, if they should fail to adjust same first with Superintendent of the Employer. No Steward shall be discharged except with just cause. The Steward will not be laid off so long as other bargaining unit employees are working, provided the Steward has the skill and ability to immediately perform the available work.

Section 3 - Member in Good Standing    Member in good standing in the Union consists solely of payment of the initiation and/or readmission fees and dues uniformly required as a condition of acquiring, or retaining membership in the Union in accordance with Federal Law.

## ARTICLE XIV
## WAGES

Effective June 1, 2003, the following minimum hourly wage rates shall be as set forth below for the respective following classifications:

| | |
|---|---|
| Newly Hired Employees as Laborers | $11.20 Per Hour |
| After Nine (9) Months | $13.40 Per Hour |
| After Eighteen (18) Months | Base Laborer Rate |

An employee in the above classification shall not replace any other employee for the first 540 days of employment. Newly hired employees shall be on probation for a sixty (60) day period.

Any laborer given duties classified as skilled laborer shall be paid the skilled laborers' scale immediate, no matter the length of employment, except apprentices or journeymen.

| | |
|---|---|
| Laborers' Base Rate | $16.89 Per Hour |
| Doing the Following Work: | Clean-up, honing machine operation, sanding, dowel hole drilling, loading and unloading, hooking, hand-held circular saw -- sawing drips and slotting |
| Skilled Laborers' Base Rate | $17.12 Per Hour |
| Doing the Following Work: | Maintenance, truck drivers, sawyers and rock facing of up to four inches |

15

| | |
|---|---|
| Journeymen Stone Planermen | $19.26 Per Hour |
| Journeymen Stone Cutter | $19.79 Per Hour |
| Journeymen Stone Carvers | $20.85 Per Hour |

Planermen

   1st Year - Skilled Laborers' Base Rate

   2nd Year - Plus Seventy-Five Cents ($0.75) Per Hour

   3rd Year - Journeymen's Scale

Stone Cutters and Carvers Rate

   1st Year - Skilled Laborers' Base Rate

   2nd Year - Plus Ninety-Eight Cents ($0.98) Per Hour

   3rd Year - Plus Seventy-Five Cents ($0.75) Per Hour

   4th Year - Journeymen's Scale

### Section 1 - Package Increase

| | |
|---|---|
| June 1, 2004 to May 31, 2005 | Four percent (4%) increase calculated from the employee's base hourly rate |
| June 1, 2005 to May 31, 2006 | Four percent (4%) increase calculated from the employee's base hourly rate |

Total economic packages to be allocated by the Union in its sole discretion between wages and any fringe benefit funds, except that the new hire rate shall be unchanged for the duration of this Agreement.

A.    Any Union member who has worked in the industry previously shall earn no less than the current minimum scale on the first (1st) day of work.

B.    Stone Carvers doing stone cutting shall be paid Stone Cutters' wages. Stone Cutters doing stone carving shall be paid Stone Carvers' wages.

16

C.    Employees working in a higher paid classification shall be paid the higher wage rate for all hours worked in that classification.

### Section 2 - Premium Rate

Employees assigned to work out on a job site, other than the mill premises, shall be paid, as a minimum, one dollar ($1.00) per hour above their current hourly rate.

Employees receiving more than the wage scale stipulated previously shall not have their scale of pay reduced through the signing of this Agreement and will have their hourly pay increased as per this Agreement over and above that rate which they were receiving.

## ARTICLE XV
## OVERTIME

All employees shall be paid at the rate of time and one-half for any work performed on Saturdays, or otherwise, in excess of forty (40) hours in any one (1) week; except where Article VIII applies.

## ARTICLE XVI
## VACATIONS

A.    All employees shall receive two (2) weeks vacation, with pay, eighty (80) straight hours, per year calculated at six and two-thirds (6 2/3) hours per pay for each month worked.

B.    Annual vacations for eligible employees will be scheduled as follows:

1.    The first week of January of each year the Employer shall make a calendar available to employees beginning first with the employee who has the longest years of service with the Company. During the month of January the calendar shall rotate to each employee who has earned vacation in descending order of hire (oldest to newest) with each requesting vacation dates that have not been previously selected.

17

2. Vacation requests made after January 31st of each year shall be evaluated on a first-come-first-serve basis.

3. All scheduling requests, shall be evaluated to ensure that each is consistent with operational needs. The Employer may deny a vacation request where such vacation would interfere with the efficient operation of the business. This determination will be based on factors such as workload and the availability of qualified replacements.

C.    All vacation pay due employees at that time shall be payable, in full, on the last pay period of May. Employees shall be entitled to pay, due them, upon termination of their employment, for any reason, on a pro-rata basis.

### ARTICLE XVII
### PLANERMEN

Under no circumstances shall any Planermen or Planermen-Apprentice finish any stone with air-hammer or mallet.

No Planerman shall furnish any tool for the machine they operate. The Employer is to supply all tools that are not used in connection with a hammer or mallet. The Employer shall pay for the sharpening of tools dulled on work.

### ARTICLE XVIII
### JOURNEYMEN

An Employer may work and use the tools of the trade, in the actual operation of fabricating stone, if no Journeyman or Apprentice is available.

**Section 1 - Work Performed by Union Journeymen**    The following work shall be performed only by Journeymen covered by this Collective Bargaining Agreement:

1. Applying all lines and patterns.

2. Stone cutting and carving in shops or at building sites.

18

3.    Stone cutting and carving necessary in the alteration of buildings, the construction of bridges, culverts, manholes, archways, etc. and cutting of street curbing.

4.    The cutting, dressing, carving, fitting of all stone. The cutting of all clean jambs, whether toothchiseled, bushhammered, carndeled or other finish of a clean character.

5.    The cutting and dressing of all concrete and all artificial stone in construction, alteration or repair, irrespective of any specified finish, including bushhammered or rustic finish.

6.    The operating of all planers, lathes, carborundum, molding machines, headers, shapers, milling machines and circular planers or any and all other attachments that may be applied to planers or other machines in cutting and fabrications, all stone and artificial stones and grinding of all tools used in fabricating of stone.

7.    The grinding of tools used in fabricating stone or in stone fabricating machinery or planers.

8.    The rock-facing of all stone greater than four inches.

9.    The drilling of lewis holes and anchor holds.

Stone carving shall be determined by that class of work for which the pattern is drawn free hand; stone cutting shall be determined by that class of work for which the pattern is drawn.

## ARTICLE XIX
## APPRENTICES

The Employer shall have the right to teach the trade to apprentices. All apprentices to stone cutting or carving shall serve for a period of not less than three (3) years. Apprentices on stone cutting machinery will serve for a period of not less than two (2) years, as prescribed in apprentice's rules agreed upon by the Union.

**Section 1 - Number of Apprentices Employed** At any given time, the Employer shall not employ more than one apprentice for every two (2) journeymen in any of its respective classifications.

**Section 2 - Grinding Tools** All apprentices to stone cutting machinery shall grind all tools that they will use in operating of machine to fabricate stone until said apprentices become journeymen.

**Section 3 - Working Hours** The working hours per day and week of apprentices shall conform to the working hours provided in this Collective Bargaining Agreement.

**Section 4 - Tools** The Employer shall provide all tools for apprentices until said apprentices become journeymen.

**Section 5 - Opportunity to Learn Business** Apprentices will be given the opportunity to work with and learn from journeymen to understand the stone business.

## ARTICLE XX

### Section 1 - Craftsmanship and Safety

A.    A high level of workmanship has been maintained in the area covered by this Agreement. The maintenance of such is essential for the future prosperity of the industry and the employees working therein. In order to sustain such high level of craftsmanship and to safeguard the safety of employees in their employment, the Employer agrees to employ only experienced and qualified workmen so that the standards of skill and safety in the area will not be lowered.

B.    Accordingly, the Employer shall give preference in hiring skilled journeymen and apprentices to those who have worked in the trade. The Employer shall be sole judge of competency and shall have the right to discharge any employee for just cause.

### Section 2 - Notification

The Employer shall notify the Union, in advance, of the number and classification of employees it intends to employ from time to time. The Employer shall have the sole and exclusive responsibility for hiring, and may hire from any sources it desires without paying heed to membership in the Union or referral and clearance thereof. Similarly, the Union shall have no obligation to refer prospective employees to the Employer, but may do so if it desires. To the extent the Employer is engaged exclusively in the building and construction industry, in accordance with Section 8(f), Part III of the National Labor Relations Act, as Amended, the parties have agreed that the Employer will notify the Union of the opportunities for employment and give the Union an opportunity to refer qualified applicants for such. The Employer shall be the sole judge as to whether to accept or reject and shall give no preference or priority to referred people over non-referred people. In the event the provisions of this section are declared unlawful and not in accordance with the National Labor Relations Act, as amended, then the provisions shall become inoperative and void and the parties

shall immediately meet to negotiate a legal mutually acceptable substitute. The other provisions of this Agreement shall not be affected thereby.

## ARTICLE XXI
## SUBCONTRACTING

It is not the intent of the Company to displace or eliminate bargaining unit personnel through the use of subcontracting and the employer agrees that it will not subcontract unit work where such action would result in the layoff of unit personnel.

Further, the Employer agrees that it will subcontract work covered by this agreement to another Employer who pays equivalent wages and benefits as per this agreement. If such subcontractee is unavailable, the Employer may sublet to any other entity provided the Employer obtains the prior approval of the Union business manager. Unless the Union can show that such subcontracting would be substantially detrimental to the unit, such approval shall not be unreasonably withheld. The above restriction on subcontracting shall not apply to lathe work unless and until the Employer obtains a lathe.

**Rebates**    Employers in the region, cut stone labor employees, or their agents shall not accept or give, directly or indirectly any rebate on wages, whether by giving, or by receiving, gratuities, or otherwise.

## ARTICLE XXII
## CLOTHING ALLOTMENT

Rain clothing and hard hats will be furnished without charge to all employees, but will remain the property of the Employer. Effective the last pay period of May of each year, a clothing allotment of One-Hundred dollars ($100.00) per year will be given to all employees for coveralls. These coveralls will remain the property of the employee, who will be responsible for their repairs and laundering. New employees, with less than a year's seniority, shall be entitled to a clothing allotment on a pro-rata basis.

22

## ARTICLE XXIII
## DRUG & ALCOHOL TESTING

Section 1 -  The parties recognized the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs.  The purpose of this program is to establish and maintain a safe and health work environment for all employees.

Section 2 -  A pre-employment drug and alcohol test may be administered to all applicants for employment.

Section 3 -  A test may be administered in the event a supervisor has a reasonable cause to believe that the employee has reported to work under the influence, or is under the influence while on the job.  Testing may also be required if an employee is involved in a workplace accident or if there is a workplace injury.  During the process of establishing reasonable cause for testing, the employee has the right to request his Steward to be present.

Section 4 -  Prior to administering a drug or alcohol test, the Employer shall notify the Union, by telefax transmission, and the Steward of the tested employee's name and the date, time and location of the test.

Section 5 -  All testing shall be conducted by laboratories accredited by the National Institute on Drug Abuse ("NIDA") utilizing NIDA-recommended standards and procedures.

Section 6 -  Employees with a confirmed positive test, and employees who refuse to submit to a test, are subject to immediate discharge.  If an employee is removed from the payroll at any time during this process, and the employee's sample is not confirmed positive under NIDA standards, then the employee shall be reinstated with full back pay.

**Section 7 -** Employees are encouraged to seek help for a drug or alcohol problem before it deteriorates into a disciplinary matter.  If an employee voluntarily notifies supervision, prior to providing a sample for testing, that he or she may have a substance abuse problem, the Employer will permit the employee on a single occasion to enter into a drug-counseling program at no cost to the employer.  Once the employee obtains a certification of completion of the program and subject to job availability, the Employee will return to work.  Other than as provided herein, reinstatement of the employed shall be at the Employer's sole discretion.

## ARTICLE XXIV
### ENTIRE AGREEMENT OF PARTIES

This represents the entire Agreement of the parties, it being understood that there is no other Agreement or understanding, either oral or written.  The Employer understands that the Union is a Fraternal Society and as such, and in keeping with the provisions of the National Labor Relations Act, as amended, has the right to prescribe its own rules and regulations with respect to the acquisition or retention of membership in the Union or with respect to any other matters for its own use.  However, such rules or regulations, whether contained in a by-law, constitution, or otherwise, shall have no effect, directly, or indirectly on this Collective Bargaining Agreement, any employment relationship or relationship between the parties.

## ARTICLE XXV
### INVALIDITY AND SEVERABILITY

If any provision of this Agreement is, or is hereafter found to be, in contravention of the Federal, State, city laws or regulations, such provision shall be null and void and shall be superseded by the appropriate provisions of such laws, so long as the same is in force and effect, but all other provisions of this Agreement shall continue in force and effect; provided, however,

24

permanently), assign work, promote, demote for cause, or recall; to make and enforce reasonable rules and regulations, to schedule the hours of work; to determine the products, services, processes, and extent of the business or production or operations, the types and quantities of machinery, equipment and materials to be used, the nature, extent, duration, character and method of operation including (but not limited to) the right to determine the number and utilization of personnel; quality and quantity of workmanship and work required to insure maximum mobility, flexibility and efficiency of operations; and to determine the size, number and location of its facilities; all of which are vested exclusively in the Company except as expressly abridged by a specific provision of this Agreement.

**GALLOY & VAN ETTEN
CUT STONE**

_____
Signature

_____
Title

_____
Address

_____
City, State, Zip Code

_____
Telephone

_____
Date

**L.I.U.N.A.**
**LOCAL UNION NO. 225**
**2500 EAST DEVON AVE., #101**
**DES PLANES, ILLINOIS**

_____
Signature

_____
Title

_12 -10 -03_____
Date

**Construction and General Laborers'
District Council of Chicago and Vicinity**

_____
Signature

_____
Title

_____
Date

_____
Signature

26

# RESTATED AGREEMENT

### AND

# DECLARATION OF TRUST

#### CREATING

# LABORERS'
# PENSION FUND

With Amendments Through
May 31, 2002


EXHIBIT
B-3

(b)     To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)     To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

Section I.     IN GENERAL.  In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto.  Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work.  No

-24-

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2.    DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Fund. The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process. including court fees. audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

-26-

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3.    REPORT   ON   CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees. on demand. the names of its employees, their social security numbers, the hours worked by each employee, and such

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

## FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

Section 1.    FILING OF A CLAIM.    Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

-28-

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1. Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2. Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3. Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4. Cash disbursement journals and general ledgers.

5. Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.        .

6. Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7. Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8. Daily time records filed by employees or supervisors.

9. Source documents and lists of job codes and equipment codes.

10. Certified payrolls for public sector jobs where such payrolls are required.

11. Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12.  Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13.  If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1

1.  Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2.  Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union.  In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records.  The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof.    Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3.  When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied.  When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer.  If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept.  Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct.  All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4.  An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

1

**4. Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**.  If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit.  An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**.  Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods.  If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**.  Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

AMENDMENT TO THE
RESTATED AGREEMENT AND DECLARATION OF TRUST
CREATING LABORERS' PENSION FUND

WHEREAS, Article XII of the Restated Agreement and Declaration of Trust ("Trust Agreement") of the Laborer's Pension Fund (the "Fund") provides that the Board of Trustees have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching

1

themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

The following is added as Section (4) to Article VII, "Funding Pension Plan Benefits":

"Section 4.  ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)     EMPLOYER OWNED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)     EMPLOYER OPERATED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c) **PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.** The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d) **MISCELLANEOUS PROVISIONS.** The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

<u>III.</u>

Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

**CHARLES COHEN**     **DATE** 9-18-06

**JOSEPH COCONATO**     **DATE** 9/13/06

**ALAN ESCHE**     **DATE** 9/18/06

**JAMES P. CONNOLLY**     **DATE** 9/18/06

**ROBERT C. KRUG**     **DATE** 9/18/06

**J. MICHAEL LAZZARETTO**     **DATE** 9/18/06

**RICHARD E. GRABOWSKI**     **DATE** 9/18/06

**FRANK RILEY**     **DATE** 9/18/06

**DAVID H. LOHG**     **DATE** 9/18/06

**LARRY WRIGHT**     **DATE** 9/18/06

**GARY LUNDSBERG**     **DATE** 9/18/06

**JEFF ZIEMANN**     **DATE** 9-18-06

4

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

Restated through
July 1, 2003



EXHIBIT
B-4

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1. IN GENERAL. In order to fund the Benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.  Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.  Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.  Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.  Cash disbursement journals and general ledgers.

5.  Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.        .

6.  Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.  Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.  Daily time records filed by employees or supervisors.

9.  Source documents and lists of job codes and equipment codes.

10.  Certified payrolls for public sector jobs where such payrolls are required.

11.  Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12.  Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13.  If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above.  However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above.  In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.  The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1.  Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2.  Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union.  In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records.  The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof.   Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3.  When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied.  When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer.  If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept.  Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct.  All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4.  An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

    4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

    1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

    2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

    3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

    4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

## AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
## OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND
## GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

WHEREAS, Article XI of the Restated Agreement and Declaration of Trust ("Trust Agreement") provides that the Board of Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Fund") have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

I.

**The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":**

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

II.

**The following is added as Section (4) to Article VI, "Employer Contributions":**

"Section 4.  ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)    EMPLOYER OWNED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    EMPLOYER OPERATED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)  <u>PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.</u>  The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)  <u>MISCELLANEOUS PROVISIONS.</u>  The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

<u>III.</u>

<u>Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.</u>

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

| CHARLES J. GALLAGHER | DATE | JAMES P. CONNOLLY | 9/19/06 DATE |
| ALAN ESCHE | 9/19/06 DATE | RANDY DALTON | 9/19/06 DATE |
| RICHARD E. GRABOWSKI | 9/19/06 DATE | MARTIN FLANAGAN | 9-19-06 DATE |
| DAVID H. LORIG | 9/19/06 DATE | LIBERATO NAIMOLI | 9/19/06 DATE |
| DENNIS MARTIN | 9/19/06 DATE | SCOTT PAVLIS | 9/19/06 DATE |
| TIM J. SCULLY | 9/19/06 DATE | FRANK RILEY | 9/19/06 DATE |

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LABORERS' PENSION FUND and** | ) | |
| **LABORERS' WELFARE FUND OF THE** | ) | |
| **HEALTH AND WELFARE DEPARTMENT** | ) | |
| **OF THE CONSTRUCTION AND GENERAL** | ) | |
| **LABORERS' DISTRICT COUNCIL OF** | ) | |
| **CHICAGO AND VICINITY, and JAMES S.** | ) | |
| **JORGENSEN, Administrator of the Funds,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 08 C 2269** |
| **v.** | ) | |
| | ) | **Judge Zagel** |
| **GALLOY AND VAN ETTEN, INC., an Illinois** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**DECLARATION OF JERROD OLSZEWSKI**</u>

I, JERROD OLSZEWSKI, declare and state as follows:

1.      I am Funds Counsel for Plaintiffs Laborers' Pension Fund and Laborers'

Welfare Fund of the Health and Welfare Department of the Construction and General

Laborers' District Council of Chicago and Vicinity (the "Funds"), Plaintiffs in the above-

referenced action.  This Declaration is submitted in support of the Funds' Motion for

Judgment in Sum Certain against Defendant Galloy and Van Etten, Inc..

2.      Shareholders of the law firms of Allison, Slutsky & Kennedy, out-of-

house collection counsel for the Laborers' Funds, bill Funds at a rate of $175.00 per hour.

Affiant, as in-house counsel for Funds has first-hand knowledge that the hourly rate of

$175.00 has been found reasonable and has been awarded by many courts in collection

proceedings.

3.      In house counsel for Funds, Patrick T. Wallace, received a Bachelor of



Arts Degree from the University of Illinois at Urbana- Champaign in 1992 and a Juris

Doctor Degree from the University of DePaul College of Law in 1995. He was admitted

to the bar of the State of Illinois in November 1995 and to the bar of the United States

District Court for the Northern District of Illinois in December 1995. He has also been

admitted to the bar of the United States District Court for the Central District of Illinois.

He was admitted to the Trial Bar of the Northern District of Illinois on September 20,

2000. From November 1995 to August 2000 he practiced labor and employment law as

an associate at the law firm of Katz, Friedman, Eagle, Eisenstein & Johnson (formerly

Katz, Friedman, Schur & Eagle). In September 2000, he became Funds Counsel for the

Laborers' Pension Fund and Laborers' Welfare Fund for the Health and Welfare

Department of the Construction and General Laborers' District Council of Chicago and

Vicinity.

      4.     Jerrod Olszewski, in-house counsel for Funds, received a Bachelor of Arts

Degree from Benedictine University in 1993 and a Juris Doctor Degree from the John

Marshall Law School in 2002. I was admitted to the bar of the State of Illinois in May,

2002, and to the bar of the United States District Court for the Northern District of

Illinois in May, 2002. From May, 2002 to December, 2004, I practiced labor and

employment law as an associate at the law firm of Katz, Friedman, Eagle, Eisenstein &

Johnson, former out-of-house counsel to the Laborers' Funds, with the majority of my

work being spent representing the Laborers' Funds. In December, 2004, I became in-

house counsel for the Funds.

      5.     Based on the foregoing, $175.00 represents a fair and reasonable market

rate for my and Patrick T. Wallace's in-house legal services to the Funds in this matter.

6.      Christina Krivanek, in-house counsel for the Laborers' Funds, received a Bachelor of Arts Degree from The Ohio State University in 2002 and a Juris Doctor Degree from the DePaul University College of Law in 2005.  She was admitted to the bar of the state of Illinois in November 2005 and to the bar of the United States District Court for the Northern District of Illinois in January 2006.  In January 2006, she became in-house counsel for the Laborers' Funds.

7.      Amy N. Carollo, in-house counsel for the Laborers' Funds, received a Bachelor of Arts Degree from Illinois State University in 2000, Masters of Science from University of Illinois at Chicago in 2002 and a Juris Doctor from Chicago-Kent College of Law in 2005.  She was admitted to the bar of the State of Illinois in November of 2005 and to the bar of the United States  District Court for the Northern District in January 2006.  In March 2006, she became in-house counsel for the Laborers' Funds.

8.      Based on the foregoing, $150.00 represents a fair and reasonable market rate for Christina Krivanek and Amy N. Carollo's in-house legal services to the Funds in this matter.

9.      Exhibit C-1 attached hereto sets forth the time expended to date by in-house counsel on this matter.  As set forth in that Exhibit, we have expended 6.3 hours totaling $1,102.50 in attorneys' fees and $419.60 in costs totaling $1,522.10.

I, the undersigned, certify under penalty of perjury that the foregoing is true and correct.

Date:  _6/11/08_      _____
                                              Jerrod Olszewski

3

Laborers Pension and Welfare Funds
11465 Cermak Rd.
Westchester, IL  60154

Invoice submitted to:
Gallory

June 11, 2008

Invoice #10001

### Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 4/14/2008 JO | 2 Telephone conference with M. Christopher re: new lawsuit referral, reviewed contract and referral fax, corp search | 0.50 175.00/hr | 87.50 |
| 4/15/2008 JO | Drafted complaint, read Cut Stone Construction contract | 1.00 175.00/hr | 175.00 |
| 4/16/2008 JO | 3 Telephone conference with  and meeting with Local 225 re: new contract, read new contract | 0.90 175.00/hr | 157.50 |
| 4/17/2008 JO | Telephone conference with Local 225 re: signature page, reviewed CBA, edited complaint | 0.50 175.00/hr | 87.50 |
| 4/18/2008 JO | Telephone conference with  Local 225 re: contract, 3 Telephone conference with  M. Christopher re: reports | 0.70 175.00/hr | 122.50 |
| 4/21/2008 JO | Telephone conference with  Christopher re: Status, Edited Complaing, organized exhibits | 0.60 175.00/hr | 105.00 |
| 4/23/2008 JO | Drafted letter to District Council. | 0.20 175.00/hr | 35.00 |
| 5/5/2008 JO | Telephone conferences (2) with M. Christopher re: status; memo to file re: same; letter to Defendant. | 0.30 175.00/hr | 52.50 |
| 6/11/2008 JO | Telephone conference with  M. Christopher, reviewed file, drafted Motion for Entry of Default Judgment, affidavit of M. Christopher, declaration of attorney fees, order, organized exhibits | 1.60 175.00/hr | 280.00 |
| | For professional services rendered | 6.30 | $1,102.50 |



EXHIBIT
G1
tabbies

Gallory

Page    2

Additional Charges :

|  |  | Amount |
|---|---|---|
| 4/21/2008 | Photocopies of Complaint, etc. | 9.60 |
|  | Filing fee. | 350.00 |
| 4/30/2008 | Service of Summons and Complaint. | 60.00 |
|  | Total additional charges | $419.60 |
|  | Total amount of this bill | $1,522.10 |
|  | Balance due | $1,522.10 |

Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Jerrod Olszewski | 6.30 | 175.00 | $1,102.50 |

## **CERTIFICATE OF SERVICE**

The undersigned attorney of record certifies that he caused a copy of the foregoing Motion for Entry of Default Judgment in Sum Certain to be served upon the individuals listed below via U.S. Mail, postage pre-paid, on this 12th day of June, 2008.

Galloy and Van Etten, Inc
Mr. Jack Van Etten, President
11756 S. Halsted St.
Chicago, IL  60628


/s/ Jerrod Olszewski

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LABORERS' PENSION FUND, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 08 C 2269** |
| **v.** | ) | |
| | ) | **Judge Zagel** |
| **GALLOY AND VAN ETTEN, INC., an Illinois** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JUDGMENT ORDER

This matter having come to be heard on the Motion of Plaintiffs Laborers' Pension Fund, Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and James S. Jorgensen, Administrator of the Funds, (collectively "Funds"), for an Entry of Default Judgment against Defendant Galloy and Van Etten, Inc., due notice having been given, and the Court being fully advised in the premises,

IT IS HEREBY ORDERED THAT:

1.    Default judgment is hereby entered in favor of Funds and against Defendant Galloy and Van Etten, Inc. in the amount of $1,522.10 representing reasonable attorneys fees and costs incurred by Funds in this matter.

2.    Defendant is to pay post-judgment interest on all amounts set forth herein until they are paid to the Funds.

ENTER:

_____
The Honorable James B. Zagel
United States District Court Judge

Dated:_____

PDF NOT LEGIBLE, DELETED

PDF NOT LEGIBLE, DELETED